August 8, 1991

# IN THE SUPREME COURT OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

COMMONWEALTH PORTS AUTHORITY ) APPEAL NO. 90-005
and DUTY FREE SHOPPERS, LTD., ) CIVIL ACTION NO. 89-948

 Plaintiffs/Appellants, )

 vs. ) OPINION

HAKUBOTAN SAIPAN ENTERPRISES, )
INC., a Commonwealth Corpora- )
tion, and ANTHONY CRUZ AYUYU, )
dba PACIFIC FORWARDERS CO., )

 Defendants/Appellees. )
_____ )

Argued and submitted March 12, 1991

Counsel for Plaintiffs/Appellants: Michael A. White, Esq.
 White, Novo-Gradac & Manglona
 P.O. Box 222 CHRB
 Saipan, MP 96950

 William J. Blair, Esq.
 Klemm, Blair, Sterling & Johnson
 Suite 1008 Pacific News Building
 238 Archbishop F.C. Flores St.
 Agana, GU 96910

Counsel for Defendants/Appellees: Donald C. Williams, Esq.
 Carlsmith, Ball, Wichman,
 Murray, Case, Mukai & Ichiki
 P.O. Box 241 CHRB
 Saipan, MP 96950

BEFORE: DELA CRUZ, Chief Justice, VILLAGOMEZ, Justice, and KING,*

Special Judge.

_____

*Chief Justice, Supreme Court, Federated States of Micronesia

VILLAGOMEZ, Justice:

This is an appeal from a dismissal of an action brought by Commonwealth Ports Authority ("CPA") and Duty Free Shoppers, Ltd., ("DFS") challenging the use of the air cargo facility at Saipan International Airport by Hakubotan Saipan Enterprises, Inc. ("Hakubotan") and Pacific Forwarders. CPA and DFS contend that such use violates the Master Concession Agreement given DFS by CPA.

## I.

On September 12, 1985, the Commonwealth enacted Public Law 4-60, empowering CPA to award a duty-free retail concession, a non duty-free concession, or a master concession at any NMI port of entry[1] to a person[2] selected by the agency. 4 CMC § 2201-2213

---

[1]According to 4 CMC § 2201(e):

> "Port of entry" means any publicly owned or operated sea or air port in the Commonwealth, together with all related lands and facilities. These include, but are not limited to:
> (1) Saipan:
> (A) Tanapag Harbor; and
> (B) Saipan International Airport.
>
> (2) Tinian:
> (A) Tinian Harbor; and
> (B) West Tinian International Airport.
>
> (3) Rota:
> (A) Rota Harbor; and
> (B) Rota International Airport.

[2]"'Person' means any individual, partnership, proprietorship, company, corporation, joint venture, association, or other enterprise or entity." 4 CMC § 2201(d).

(hereafter "the Act").

On November 13, 1985, CPA and DFS executed a Master Concession Agreement ("MCA") under which DFS was awarded the "exclusive" use of any port of entry to offer to sell, to sell, or to deliver any merchandise "in less than wholesale quantity to or for the direct or indirect benefit of a departing individual . . . ." MCA, paragraph 3(d)(i) at 9.[3]

In July of 1989, Hakubotan implemented a "Liquor Home Delivery

---

[3]The exclusivity provision in the MCA is almost identical to the exclusivity provision in the Act. The Act provides:

> [T]he Commonwealth Ports Authority shall, apart from the master concession, confer no right upon, nor suffer nor allow, any person to use any port of entry to offer to sell or sell duty-free or any other type of merchandise, except as specifically provided in Section 2201(c), or to deliver duty-free or any other type of merchandise, sold in less than wholesale quantity, to or for the direct or indirect benefit of a departing individual (regardless of the time or place of the individual's departure and regardless of the time or place of the order and/or payment for the merchandise).

4 CMC § 2205(c). The MCA provides:

> DFS shall have the sole and exclusive right (A) to operate facilities at each and every Port of Entry for the purpose of offering to sell and selling Duty-Free-Merchandise and any other item of Merchandise, and (B) to use each and every Port of Entry to deliver Duty-Free-Merchandise and any other item of Merchandise, sold in less than a wholesale quantity, to or for the direct or indirect benefit of a departing individual, regardless of the time or place of the individual's departure and regardless of the time or place of the order and/or payment for such Merchandise.

Paragraph 3(d)(i) at 9.

System" ("Hakubotan system") by which liquor is ultimately delivered to a customer's home in Japan. A Japanese tourist purchases liquor at the Hakubotan store[4] on Saipan and fills out an address card and customs declaration form. The liquor and documents are then placed in a bag for pickup by Pacific Forwarders, a company owned by appellee Anthony C. Ayuyu ("Ayuyu").[5]

Pacific Forwarders packages the liquor in packing material supplied by Hakubotan and transports it, using a Hakubotan truck, to the air cargo section of Saipan International Airport.

At the air cargo office an airway bill is prepared identifying Pacific Forwarders as the shipper and Japan Travel Bureau (JTB) Cargo as the consignee. By pre-arrangement with Hakubotan, JTB Cargo accepts the liquor in Japan and delivers it to the customer (or his/her designees) there. Upon receipt, the customer pays freight charges and a Japanese government tax.

Upon learning of the Hakubotan system, CPA felt that Hakubotan and Ayuyu were using the airport to deliver merchandise in less than wholesale quantity within the meaning of the Act--thus violating the Act and interfering with the MCA.

By letter dated July 24, 1989, CPA's counsel--noting that the agency had statutory authority to award exclusive use of NMI ports

---

[4]The Saipan Hakubotan store is located in Chalan Laulau, outside any NMI port of entry.

[5]Ayuyu is the brother of Jose P. Ayuyu, manager of the Saipan Hakubotan store.

217

of entry to DFS under a master concession--told Ayuyu to cease such operation. Ayuyu disregarded the letter and continued to forward merchandise under the Hakubotan system.

On September 24, 1989, CPA sued Hakubotan and Ayuyu. The agency asked: (1) that Hakubotan and Ayuyu be enjoined from continuing the Hakubotan system; (2) that the Hakubotan system be declared as being in violation of the Act and 2 CMC § 2122(b)[6] as endangering the 1987 CPA bond issue and indenture,[7] and as tortiously interfering with the MCA. It also asked for damages. DFS subsequently intervened as party-plaintiff, seeking identical relief.

The trial court heard CPA and DFS's motion for a preliminary injunction on October, 1989. It denied the motion and ruled that

---

[6]According to this provision:

> In addition to the powers and duties elsewhere conferred and imposed, the Authority shall have the following powers and duties:
>
> . . . .
>
> (b) To have exclusive jurisdiction to plan, establish, develop, construct, enlarge, improve, maintain, equip, operate and regulate the ports within the Commonwealth and to protect, police, and to establish minimum building codes and regulations for its sea and air ports.
>
> . . . .

[7]In 1987, CPA issued revenue bonds totalling over $15,000,000. In an indenture, the agency pledged its gross revenues to the repayment of the bonds. "As a result of the business arrangement of the defendants, CPA is in jeopardy of losing revenues that it has relied on and has pledged, is in jeopardy of being in breach of the bonds and the bond indenture, and is in jeopardy of losing its ability to issue additional bonds." Complaint at 6-7.

218

the Hakubotan system neither violated the Act nor tortiously interfered with the MCA. _Commonwealth Ports Authority v. Hakubotan Saipan Enterprises, Inc._, Civil Action No. 89-948 (N.M.I. Super. Ct. Nov. 9, 1989).

Hakubotan and Ayuyu thereafter moved to dismiss the complaint for failure to state a claim upon which relief could be granted, pursuant to Com.R.Civ.P. 12(b)(6). CPA and DFS countered with a motion for summary judgment and for reconsideration of the denial of its motion for preliminary injunction. The trial court ruled in favor of Hakubotan and Ayuyu, and dismissed the complaint. _Commonwealth Ports Authority v. Hakubotan Saipan Enterprises, Inc._, Civil Action No. 89-948 (N.M.I. Super. Ct. Jan. 26, 1990) (summary judgment and memorandum decision).

CPA and DFS timely appealed.

## II.

The issue raised on appeal is whether the trial court erred in ruling that the Hakubotan system does not violate the Act and does not interfere with the MCA.

We review a grant of summary judgment de novo. If there is no genuine issue of material fact, the analysis shifts to whether the substantive law was correctly applied. _Aldan-Pierce v. Mafnas_, No. 89-003 (N.M.I. July 5, 1991).

We begin our analysis by noting that, under the MCA, DFS clearly has the exclusive right to offer to sell or to sell any merchandise _at_ the airport, or to deliver merchandise in less than wholesale quantity to departing individuals _at_ the airport. We

219

further note that, under the Hakubotan system, the delivery of the merchandise occurs and is completed in Japan, not at the Hakubotan store or at the airport. Finally, it is not disputed that, if Hakubotan delivers the merchandise to a customer at its store, and the customer, in turn, transmits the merchandise to an independent shipper, no violation of the Act or the MCA would occur.

The dispute between the parties centers on the meaning of the following language in the Act:

> [T]he Commonwealth Ports Authority shall, apart from the master concession, confer no right upon, nor suffer nor allow, any person to use any port of entry to offer to sell or sell . . . merchandise . . . or to deliver duty free or any other type of merchandise, sold in less than a wholesale quantity, to or for the direct or indirect benefit of a departing individual . . . .

4 CMC § 2205(c) (emphasis added).

CPA and DFS contend that the clause "use any port of entry . . . to deliver" refers to "any activity involved in any stage of the delivery process,"[8] or "'use' of the airport as any part of the delivery process."[9] "Use of the airport facilities is . . . an essential step in the Hakubotan home delivery system ."[10] Their "system violates 4 CMC §§ 2201 et. seq., which precludes anyone . . . from making 'use' of the airport as any part of the delivery process."[11] CPA and DFS interpret "delivery" to mean delivery at the airport or any place beyond the airport, so long as the airport

---

[8] Appellants' brief at 3 (emphasis added).

[9] Appellants' brief at 7 (emphasis added).

[10] Appellants' brief at 24. (emphasis added).

[11] Appellants' brief at 25 (emphasis added).

is used in the process of delivery. They assert that their interpretation of 4 CMC § 2205(c) is based on the common meaning of the language used therein.

Hakubotan and Ayuyu, on the other hand, contend that the common meaning of "deliver," as used in the statute, is "physical delivery of the merchandise directly to a departing passenger, or to some individual such as a cabin attendant on his behalf, or possibly by direct belly-loading of merchandise in a cargo hold of the aircraft for the benefit of the departing passenger . . . . [s]uch delivery is the final step in consummation of the sale of the merchandise."[12] "Delivery . . . is completed within the confines of the port."[13] Hakubotan and Ayuyu interpret "use. . . to deliver" to mean delivery that is completed at the airport.

## III.

"When interpreting a statute, the objective is to ascertain and give effect to the intent of the legislature." In re Estate of Rofag, No. 89-019, slip op. at 10, n.10 (N.M.I. Feb. 22, 1991), quoting Office of the Attorney General v. Cubol, 3 CR 64, 73 (D.N.M.I. App. Div. 1987). A basic principle of construction is that language should be given its plain meaning. CNMI v. Nethon, No. 90-062 (N.M.I. Dec. 19, 1990), CNMI v. Hasinto, No. 90-14 (N.M.I. Nov. 21, 1990).

In applying this principle of statutory construction, our role

---

[12]Appellees' brief at 14 (emphasis added).

[13]Appellees' brief at 15 (emphasis added).

is to ascertain what the legislature intended by applying the plain meaning of the word "deliver." The Act itself does not indicate that the word "deliver" is meant to have a technical legal meaning. And, "it is assumed that the legislative purpose is expressed by the ordinary meaning of the word used." Cubol, supra at 73. Thus, the issue is whether the term "deliver" in its ordinary sense, means the process of delivery, or the completion of delivery. If the plain meaning of the word "deliver" includes any stage in the process of delivery, then the Hakubotan system would be within that meaning and would violate the Act. On the other hand, if the plain meaning of "deliver" is the completion of delivery, then the Hakubotan system would not violate the Act, since the delivery is completed in Japan, not at the airport.

The word "deliver"[14] is defined as meaning "to take and hand over to or leave for another: to CONVEY .... "Convey", in turn, is defined as meaning "to transfer or deliver to another." Webster's 9th New Collegiate Dictionary, 287, 336 (1984) (emphasis added). This definition parallels the legal definition of the term "actual delivery," which is defined: "Actual delivery consists in the giving of real possession to the vendee or his servants or special agents, who are identified with him in law and represent him. It is a formal immediate transfer of the property to the vendee." Black's Law Dictionary, 6th Edition, 428 (1990) (emphasis added).

The above definitions constitute the plain and ordinary

---

[14]For purposes of this analysis, "deliver" and "delivery" are synonymous.

222

meaning of the word "deliver", which means actual or complete delivery. Therefore, in interpreting the plain and common meaning of the Act, we shall apply that definition.

In so doing, we conclude that the word "deliver," in its ordinary sense, does not mean any particular stage in the process of delivery. Rather, it means the completion of delivery itself. The legislature must have realized that this meaning of the word "deliver" corresponds with CPA's overall jurisdiction.

CPA's jurisdiction extends to all NMI ports of entry, but not beyond. Thus, the restriction on use of the Saipan airport to deliver merchandise in less than wholesale quantity to a departing individual cannot extend to deliveries completed outside the airport. Since delivery of liquor under the Hakubotan system is not completed until the product reaches Japan, the Hakubotan system does not violate 4 CMC § 2205(c). Neither does it interfere with the MCA.[15]

We find that the trial court correctly concluded that the legislature intended the word "deliver" to have its ordinary and common meaning. Further, the trial court correctly concluded that "to deliver" means to deliver <u>at</u> the airport or, stated

---

[15]Appellants' contention that a ruling adverse to their position (1) would affect CPA revenue needed to retire its 1987 bond issue and (2) would violate its bond indenture is not persuasive. The so-called "competitive edge" DFS presumably has, absent the Hakubotan system, makes little difference to the situation where a customer purchases and receives a product at the Hakubotan store downtown. Further, we fail to see how the bond indenture would be violated by a ruling in favor of Hakubotan, where the ruling expressly finds the Hakubotan system neither violates the Act nor interferes with the MCA.

223

differently, to use the port of entry to complete delivery. Whether the merchandise is delivered to the departing individual, or for his/her direct benefit, or for his/her indirect benefit, as long as it is delivered at the airport, the Act applies. If it is not delivered at the airport, then the Act does not apply.

In our endeavor to ascertain the intent of the legislature we have analyzed the entire language of 4 CMC § 2205(c) instead of just the phrase "use to deliver." Cubol, supra at 73. ("the legislative intent is to be discerned from a reading of the statute as a whole and not from a reading of isolated words"). We note that section 2205(c) restricts both the use of the airport to deliver merchandise, as well as the use of the airport to offer to sell or sell merchandise.

At oral argument, CPA conceded that the phrase "use the port of entry to offer to sell" means to offer to sell at the airport. Likewise, "use of the port of entry to sell" means to sell at the airport.

If that is the clear intent of the legislature with regard to the use of the airport to "offer to sell" or "sell", absent the word "at", it logically follows that such is also the intent of the legislature with respect to the use of the airport to "deliver." Our interpretation of "delivery" comports with another fundamental rule of statutory construction. "A court should avoid interpretations of a statutory provision which would defy common sense [or] lead to absurd results . . . ." Cubol, 3 CR at 78. To interpret 4 CMC § 2205(c) and the MCA, as CPA and DFS urge, would

224

in effect prohibit individuals or businesses from using any NMI port of entry to <u>transport</u> merchandise for the benefit of any departing passenger. Such interpretation would cover any method of transportation--including air freight, ocean freight and the postal system--so long as an NMI port is utilized at some stage in the delivery process.[16] We reject such a broad and sweeping interpretation of a provision which restricts the use of a public facility.[17]

The Superior Court judgment is AFFIRMED.

Entered this ___8th___ day of ___August___, 1991.

_____
JOSE S. DELA CRUZ, Chief Justice

_____
RAMON G. VILLAGOMEZ, Associate Justice

_____
EDWARD C. KING, Special Judge

---

[16]This interpretation would, for example, prohibit a Saipan business from sending an item purchased on Saipan by a visiting Rotanese to Rota via air freight to effectuate delivery.

[17]Where a statute grants a monopoly, a strict construction is applied. <u>See</u> <u>The Charles River Bridge v. The Warren Bridge</u>, 36 U.S. (11 Pet.) 420, 9 L.Ed. 773 (1827); <u>Stein v. Bienville Water Supply Co.</u>, 141 U.S. 67, 11 S.Ct. 892, 35 L.Ed. 622 (1891).